# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

WILBERT LESLIE,

    Petitioner,

vs.

E. K. MCDANIEL, et al.,

    Respondents.

Case No. 3:08-CV-00453-LRH-(VPC)

**ORDER**

    Before the court are the second amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (#30), respondents' answer (#50), and petitioner's reply (#51). The court finds that relief is not warranted, and the court denies the petition.

**Procedural History**

    After a jury trial in the Eighth Judicial District Court of the State of Nevada, petitioner was convicted of burglary, robbery with the use of a deadly weapon, and first-degree murder with the use of a deadly weapon. For the count of murder, petitioner was sentenced to death. Ex. 18 (#40). Petitioner appealed, and the Nevada Supreme Court affirmed. Ex. 24 (#40).

    Petitioner then filed a proper-person post-conviction habeas corpus petition in state court. Ex. 31 (#41). Counsel was appointed, and counsel filed a supplemental petition. Ex. 32 (#41). The district court denied the petition. Ex. 35 (#41). Petitioner appealed. The Nevada Supreme Court affirmed the finding of guilt, but it vacated the death sentence and remanded to the district court for a new penalty hearing. Ex. 41 (#41).

After returning to the district court, the parties entered into a penalty hearing agreement. The prosecution agreed not to seek the death penalty. Petitioner agreed to be sentenced to life imprisonment without the possibility of parole for first-degree murder and to an equal and consecutive term for the use of a deadly weapon. Petitioner agreed to be sentenced to ten years imprisonment for the burglary count. On the count of robbery with the use of a deadly weapon, petitioner agreed to be sentenced to fifteen years for robbery and an equal and consecutive term for use of a deadly weapon. The sentences for those two counts run concurrently with the sentences for first-degree murder with the use of a deadly weapon. Ex. 44 (#42). The court agreed and sentenced petitioner accordingly. Ex. 47 (#42). Petitioner appealed, and then he voluntarily dismissed his appeal. Ex. 50 (#42).

Petitioner then commenced this action. His original petition (#10) contained eight grounds. Ground 1 was a claim of prosecutorial misconduct for injecting personal opinion into the closing argument, and it also was a claim of ineffective assistance of counsel for not objecting to that misconduct. Ground 2 was a claim that the district court erred in allowing the testimony of one witness with whom the prosecution had bargained for particular testimony. These two grounds have remained the same in the first amended petition (#29) and the second amended petition (#30). Grounds 3 though 8 of the original petition (#10) were claims of error in the penalty hearing that led to petitioner being sentenced to death. The court dismissed those grounds because the death sentence had been vacated and petitioner had agreed to be sentenced to two consecutive terms of life imprisonment without the possibility of parole. Order (#9). Petitioner then asked to stay this action while he pursued more post-conviction remedies in the state courts. The court granted his request. Order (#22).

Petitioner filed a second post-conviction petition in the state district court. Ex. 51, 52 (#42). That court dismissed the petition because it was untimely, successive, and abusive of the writ. Ex. 56 (#42) (citing Nev. Rev. Stat. §§ 34.726, 34.810). Petitioner appealed. The Nevada Supreme Court affirmed the denial for the same reasons. Ex. 58 (#42).

Petitioner returned to the court with his first amended petition (#29). The court dismissed ground 3 in that petition because it was a claim of error in the state post-conviction proceedings.

The court also directed petitioner to amend grounds 4 through 9 of that petition because he was claiming ineffective assistance of post-conviction counsel, and petitioner had no such right guaranteed by the Constitution of the United States. Order (#28). Petitioner then filed a second amended petition (#30) that omitted the claim of error in the state post-conviction proceedings and that corrected the defects in the other grounds.

Respondents moved to dismiss grounds 3 through 8 of the second amended petition (#30). The court agreed with respondents arguments and dismissed those grounds because they were procedurally defaulted in state court and because they were untimely pursuant to 28 U.S.C. § 2244(d). Order (#48). Reasonable jurists would not disagree with the court's conclusions on those grounds, and the court will not issue a certificate of appealability for them.

Grounds 1 and 2 of the second amended petition remain.

## Standard of Review

Congress has limited the circumstances in which a federal court can grant relief to a petitioner who is in custody pursuant to a judgment of conviction of a state court.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." Harrington v. Richter, 131 S. Ct. 770, 784 (2011).

> Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of this Court, § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 412 (2000); or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

Richter, 131 S. Ct. at 785. "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Id. (citation omitted). "A state

-3-

court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (citation omitted).

> [E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

Richter, 131 S. Ct. at 786.

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id., at 786-87.

## Facts

There are more facts to the case than the court discusses here. The court limits its statement of the facts to those facts relevant to grounds 1 and 2. Those grounds concern the testimony of the witness Rhesa Gamble and a comment by the prosecutor about her testimony.

On August 9, 1994, a person later identified as petitioner robbed a 7-Eleven store and killed John Prewitt, who worked there. He entered the store and demanded that Prewitt give him money from the cash register. For emphasis, he fired a bullet from his revolver into the wall above and behind Prewitt's shoulder. Prewitt opened the cash register drawer, and the robber took money out of it. The robber then shot Prewitt in the chest, killing him. The subsequent investigation recovered both bullets, and tests indicated that both were fired from the same gun.

Security-camera videotape of the incident showed that the robber fired the revolver only with difficulty.

Independent of the robbery-murder investigation, on September 3, 1994, patrol officer Leonard Lorusso noticed a gold Cadillac at a public park. The car had a broken rear window, no license plates, and expired temporary registration tags. Thinking that the car might be stolen,

1  Lorusso called for a truck to tow the car to an impound lot. Before the towing, Lorusso searched the
2  car for its inventory. He found a duffle bag that contained a revolver. Lorusso impounded the
3  revolver.
4      Rhesa Gamble had purchased the Cadillac, but she never registered her ownership. The
5  automobile dealership where she purchased the Cadillac took possession of it from the impound lot.
6  Shortly after its towing on September 3, 1994, Gamble called the dealership. She asked about the
7  gun and was told that no gun was in the car when the dealership took possession of the car. Gamble
8  never took the steps needed to regain possession of the Cadillac.
9      An anonymous tip connected the murder of Prewitt with the Cadillac and the gun. On
10 September 28, 2004, Detective Robert Leonard received a call from a woman on the police
11 department's secret-witness line. The caller said that the killer was named Wilbert, nicknamed
12 Tuggy. The caller did not know Tuggy's address, but did give directions to get to his house. The
13 caller noted that Tuggy's dad also was named Wilbert, and that mother and father owned two
14 Hyundais, one older, painted brown primer, and one newer, painted teal. The caller told Leonard
15 that the police probably had the murder weapon in their possession. Tuggy had given or sold the
16 murder weapon to a girl, the girl kept the gun in her Cadillac, the Cadillac was towed, and when the
17 girl was able to look at the Cadillac, the gun was no longer in it. The caller never identified herself.
18     After reviewing the records of impounded weapons, Leonard located the revolver that
19 Lorusso had impounded from the Cadillac, and he had it tested. He learned two facts from the
20 testing of the revolver. First, the revolver was the murder weapon. Second, although the revolver
21 was operable, it was defective. To fire the revolver, a person would need to apply some pressure on
22 the cylinder-release lever, manually cock the hammer, and only then pull the trigger. The security-
23 camera videotape showed that this was the method that the robber used to fire the gun. Leonard also
24 learned that Rhesa Gamble had purchased the Cadillac in which the revolver was found.
25     Leonard located the residence described in the secret-witness call. He learned that petitioner
26 lived there. He obtained a photograph of petitioner from the police department's records.

On October 7, 1994, Detectives Leonard and James Franks interviewed Gamble. She said that her boyfriend, who was named Wilbert but liked to be called Tuggy, sold her the gun for $50. The detectives showed her a photographic lineup, and she identified petitioner as her boyfriend.

The detectives then interviewed petitioner the same day. During the interview, the detectives told petitioner that Gamble's statement had placed the murder weapon in his hand. Based upon Gamble's statement and petitioner's responses to their questions, the detectives arrested petitioner.

The detectives believed that Gamble was more involved in the case than she had admitted. With court authorization, they tapped her phone line. On November 10, 1994, they recorded a conversation between Gamble and Shanee Lakes. Gamble also spoke with Rochelle Jones. To summarize the conversations, Gamble said that she drove with petitioner and a person known only as Big Dave to the 7-Eleven, so that petitioner could rob the store. Petitioner left the car and told her to drive around for a while. She did, and she returned. Petitioner was outside, and he told her to drive around some more. Again she did. When she returned the second time, petitioner entered the car. Petitioner said that he had killed Prewitt clerk because Prewitt clerk would not give him money. Petitioner gave the gun to Gamble.

On December 1, 1994, Gamble testified before the grand jury. Gamble recanted parts of her statement to the police. She testified that she actually had purchased the gun from an unknown man outside a casino. She also testified that the detectives told her what to say and whom she should identify in the photographic lineup. She was warned about perjury, but she stuck to her new statement.

On December 22, 1994, Gamble testified in a preliminary hearing. She gave the same testimony that she gave before the grand jury. The justice of the peace warned Gamble that she could be prosecuted for perjury if she was lying under oath. The prosecution then called Franks, Lakes, and Jones to testify as to what Gamble had told them. The justice of the peace determined that Gamble likely had committed perjury and ordered her arrest. Gamble was charged with murder with the use of a deadly weapon, accessory to a felony, burglary, robbery with the use of a deadly weapon, and perjury.

Gamble agreed to plead guilty to perjury in exchange for the dismissal of the other charges. In the agreement, Gamble acknowledged that her grand-jury and preliminary-hearing testimonies were false. The agreement required Gamble to testify truthfully at petitioner's trial, or the agreement would be void.

At trial, Gamble testified largely in accordance with her statement to police and her statements to her friends. The prosecution also introduced into evidence the recording of the telephone conversation between her and Lakes. On cross-examination, she testified about her previous testimony before the grand jury and at the preliminary hearing. On redirect examination, she testified that her initial statement to police was the correct statement. Lakes and Jones also testified as to what Gamble had told them.

In the defense closing argument, defense counsel argued that Gamble was lying in her statement to police, that she realized she would need to maintain that lie to keep herself out of trouble, and that Gamble finally decided to come clean and admit in her testimony before the grand jury and at the preliminary hearing that she had lied earlier. Counsel also noted how, at those two hearings, Gamble maintained that she was telling the truth even after being threatened with perjury. Ex. 15, at 73-75 (#39).

The prosecution then gave its rebuttal argument. The prosecutor said:

> And on cross-examination, she very freely discussed how detectives allegedly planted information with her, how detectives allegedly told her that number two in the photographic lineup was Tuggy before she even saw it. <u>We now know that's incorrect</u>.

Ex. 15, at 114 (#39) (emphasis added).

In ground 1, petitioner claims that defense counsel provided ineffective assistance because counsel failed to object to the sentence emphasized above. Petitioner argues that the statement was an attempt by the prosecutor to inject personal opinion and to usurp the fact-finding process.

"[T]he right to counsel is the right to the effective assistance of counsel." <u>McMann v. Richardson</u>, 397 U.S. 759, 771 & n.14 (1970). A petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984), and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable

-7-

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

Strickland expressly declines to articulate specific guidelines for attorney performance beyond generalized duties, including the duty of loyalty, the duty to avoid conflicts of interest, the duty to advocate the defendant's cause, and the duty to communicate with the client over the course of the prosecution. 466 U.S. at 688. The Court avoided defining defense counsel's duties so exhaustively as to give rise to a "checklist for judicial evaluation of attorney performance. . . . Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." Id. at 688-89.

Review of an attorney's performance must be "highly deferential," and must adopt counsel's perspective at the time of the challenged conduct to avoid the "distorting effects of hindsight." Strickland, 466 U.S. at 689. A reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (citation omitted).

The Sixth Amendment does not guarantee effective counsel per se, but rather a fair proceeding with a reliable outcome. See Strickland, 466 U.S. at 691-92. See also Jennings v. Woodford, 290 F.3d 1006, 1012 (9th Cir. 2002). Consequently, a demonstration that counsel fell below an objective standard of reasonableness alone is insufficient to warrant a finding of ineffective assistance. The petitioner must also show that the attorney's sub-par performance prejudiced the defense. Strickland, 466 U.S. at 691-92. There must be a reasonable probability that, but for the attorney's challenged conduct, the result of the proceeding in question would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," . . . and when the two apply in tandem, review is "doubly" so . . . . The

> Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (citations omitted).

On this issue, the Nevada Supreme Court held:

> During his guilt phase closing argument, the prosecutor stated, "And on cross examination, [Rhesa Gamble] very freely discussed how detectives allegedly told her that number two in the photographic lineup was [Leslie] before she even saw it. We now know that's incorrect." (Emphasis added.) Leslie contends that the prosecutor improperly asserted his personal opinion of Gamble's credibility and usurped the jury's fact-finding function by using the word "we."
>
> Even if we assume that trial counsel was deficient in not challenging the prosecutor's statement, we conclude that Leslie cannot demonstrate that the error prejudiced his defense. The prosecutor's statement addressed a portion of Gamble's testimony in which she stated that the detectives pointed to Leslie's picture before she had the opportunity to identify him in a photographic lineup. Immediately thereafter, the prosecutor inquired whether she picked Leslie out of the lineup of her own volition or because the detectives suggested that she do so. Gamble repeatedly stated that she picked Leslie's photograph out of the lineup because she recognized him. Also, Gamble later testified that the detectives did not attempt to influence her with respect to the photographic lineup. Because Gamble made it clear that she identified Leslie of her own volition and not because of the detectives' suggestion, Leslie's claim does not raise a reasonable probability that the jury's verdict would have been different had trial counsel objected to the prosecutor's statement. Therefore, the district court properly denied relief on this ground.

Ex. 41, at 3-4 (#41). There are two other factors in addition to what the Nevada Supreme Court stated. Defense counsel cross-examined Gamble on her testimony before the grand jury and at the preliminary hearing. He then argued to the jury that Gamble's prior testimony was correct and that her testimony at trial was incorrect. In other words, defense counsel invited the prosecutor's comment. Furthermore, when taken in its full context, the prosecutor's comment was the introduction to an argument. After he said, "We now know that's incorrect," the prosecutor argued at length about how the other facts of the case showed that Gamble's prior testimony could not have been anything but false. See Ex. 15, at 114-17 (#39). The prosecutor was not trying to inject personal opinion and usurp the fact-finding process; he was responding to a defense argument. The Nevada Supreme Court applied Strickland reasonably in holding that defense counsel did not provide ineffective assistance. See 28 U.S.C. § 2254(d).

In ground 2, petitioner claims that the state district court erred in allowing Rhesa Gamble to testify, because the prosecution had bargained for particularized testimony from her. This ground has two legal components. First, petitioner argues that the bargain violates state law, as stated in Sheriff v. Acuna, 819 P.2d 197 (Nev. 1991). A state-court ruling on evidence is not addressable in federal habeas corpus unless the ruling makes the proceedings fundamentally unfair. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Second, petitioner argues that the threat of prosecution effectively drove Gamble from the witness stand, in violation of the due process clause of the Fourteenth Amendment. See Webb v. Texas, 409 U.S. 95 (1972). On these issues, the Nevada Supreme Court held:

> Leslie argues that this agreement to cooperate constituted an improper bargaining for particularized testimony. See Sheriff v. Acuna, 107 Nev. 664, 669, 819 P.2d 197, 200 (1991).
>
> We conclude that the State did not improperly bargain for particularized testimony. Gamble was charged with perjury and the other charges because evidence of her October recorded statement to the police and the testimony of Shanee Lakes and Rochelle Jones all indicated that Gamble was present at the 7-Eleven with Leslie and that Leslie had sold her the murder weapon, contrary to her later testimony. In her plea agreement, Gamble admitted to giving perjurious testimony at the two previous proceedings and admitted that she drove Leslie to the 7-Eleven. Furthermore, the Agreement to Cooperate memorandum stated only that Gamble agreed to testify "truthfully" at Leslie's trial, as determined by the court. This requirement is in accord with NRS 174.061(1)(b), which states that if a defendant agrees to testify for the prosecution against another defendant in exchange for a reduced sentence, the agreement "[m]ust be in writing and include a statement that the agreement is void if the defendant's testimony is false."
>
> Leslie argues that the prosecution dictated to Gamble what the "truth" was by virtue of the fact that she was charged with perjury for her testimony at the two previous proceedings and, therefore, that this case is substantially similar to People v. Medina, 116 Cal. Rptr. 133, 135 (Ct. App. 1974) (concluding that the prosecution improperly bargained for particularized testimony when it granted defendants immunity in return for testimony on the condition that "the witness not materially or substantially change her testimony from her tape recorded statement already given to law enforcement officers"). We conclude that Leslie's argument lacks merit. Credible evidence, including Gamble's original statement to the police, her possession of the murder weapon, the testimony of Shanee Lakes and Rochelle Jones, and wiretap recordings of conversations between Shanee and Gamble, all indicated that Gamble was present with Leslie at the 7-Eleven. Therefore, pursuant to Acuna, the prosecution was permitted to bargain for specific testimony essentially consistent with the information represented to be factually true during Gamble's negotiations with the State. Acuna, 107 Nev. at 669, 819 P.2d at 200.
>
> Leslie also argues that the State's action in charging Gamble with numerous crimes constituted an improper interference with a potential defense witness which "effectively drove that witness off the stand, and thus deprived [the appellant] of due process of law under the Fourteenth Amendment." Webb v. Texas, 409 U.S. 95, 98 (1972). We disagree and note that the facts in Webb are distinctly different from those presented in the case at

> bar. In Webb, the judge told the defendant's only witness prior to testifying about the penalty for perjury and that he expected the witness to lie, and also informed the witness, who was serving a prison sentence at the time, that a conviction of perjury would hurt the witness' chances of parole. Id. at 97. The Supreme Court stated that such threatening remarks effectively drove the witness off the stand and deprived the defendant of due process. Id. at 98.
>
> No such threats were made in the instant case. The prosecutor and justice of the peace warned Gamble about perjury only after hearing some of her testimony, and the warnings were not threatening as were those in Webb. Furthermore, the district court did not err in advising Gamble of the consequences of perjury or in cautioning her about testifying truthfully. State v. Martinez, 653 P.2d 879, 884 (N.M. Ct. App. 1982).

Ex. 24, at 11-13 (#40).

This was not a situation in which Gamble gave two inconsistent statements of equal weight, and then the prosecution used the threat of a perjury charge to force her to testify with the statement that was more favorable to the prosecution. Gamble lied when she testified at the grand jury and at the preliminary hearing. The Nevada Supreme Court, quoted above, laid out all the facts that were strongly consistent with Gamble's original statement to the police. For Gamble's testimony at the grand jury and at the preliminary hearing to be true, everybody else, including Gamble herself because of her recorded telephone conversation, would need to have been lying, and lying consistently with each other. The plea bargain with Gamble did not make the proceedings fundamentally unfair.

The Nevada Supreme Court also reasonably determined that the acts of the prosecutor and the justice of the peace were different from what happened in Webb. As the Nevada Supreme Court noted, the trial judge in Webb threatened the defense witness with a prosecution for perjury before the witness could testify. Also, it was unclear in Webb whether the trial judge had any reason to give that threat, because it was unclear what the witness' testimony would have been. The witness might have intended to testify to an alibi for the defendant, which would have been problematic for the witness because the defendant had been caught red-handed. On the other hand, the defense counsel in Webb had certified to the state courts that the witness would not have been called unless he had been interviewed previously and found to have information helpful to the defense. 409 U.S. at 99 & footnote (Blackmun, J., dissenting). In contrast, Gamble did testify, and the other evidence presented in those proceedings, including her own statements people other than the police, indicated

1  that she was lying. Only after she testified was she warned about perjury, and the prosecutor and the
2  justice of the peace had good reason to warn her. Ground 2 is without merit.
3        Reasonable jurists would not find these conclusions to be debatable or wrong, and the court
4  will not issue a certificate of appealability for grounds 1 and 2.
5        Also before the court are petitioner's motion for stay and abeyance (#52), respondents'
6  opposition (#54), and petitioner's reply (#55). Petitioner asks the court to stay this action until
7  currently pending state post-conviction proceedings are concluded. Respondents correctly note that
8  the ground petitioner is raising in state court—the validity of the instruction given to jury that
9  defined willful, deliberate, and premeditated murder—is not a ground that petitioner raises in the
10 second amended petition (#30). Petitioner has not moved to amend the petition to include this
11 ground. A stay would not have any effect upon the resolution of the remaining grounds, and it is not
12 in the interest of justice to stay this action.
13       IT IS THEREFORE ORDERED that petitioner's motion for stay and abeyance (#52) is
14 **DENIED**.
15       IT IS FURTHER ORDERED that the second amended petition for a writ of habeas corpus
16 (#30) is **DENIED**. The clerk of the court shall enter judgment accordingly.
17       IT IS FURTHER ORDERED that a certificate of appealability is **DENIED**.
18       DATED this 22nd day of October, 2012.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE